| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>THE SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES,<br><br>Defendant. | CIV. 15-5079-JLV<br><br>REDACTED ORDER |

## INTRODUCTION

The United States filed this action against the South Dakota Department of Social Services ("DSS") alleging violations of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").   (Docket 26 at p. 1).   DSS filed an answer denying it violated Title VII.   (Docket 27).   DSS timely filed a motion for summary judgment, together with its statement of undisputed material facts, two affidavits with supporting exhibits and a legal memorandum.   (Dockets 41-44 & 49).   The United States filed a response to defendant's statement of material facts, an affidavit with supporting exhibits and a brief in resistance to defendant's motion.   (Dockets 53-55).   DSS filed a reply brief in support of its motion for summary judgment.   (Docket 57).

On the same day, the United States timely filed a motion for partial summary judgment, together with a statement of undisputed material facts, an affidavit and a legal memorandum.   (Dockets 45-48).   DSS filed a response to plaintiff's statement of material facts, an affidavit with supporting exhibits and

a legal memorandum. (Dockets 50-52). Plaintiff filed a reply brief in support of its motion for partial summary judgment. (Docket 56).

Based on the analysis in this order, defendant's motion for summary judgment is denied and plaintiff's motion for partial summary judgment is granted.

## PROCEDURAL HISTORY

In 2015, the United States filed the complaint against DSS under Title VII. (Docket 1). In the fall of 2016, the United States filed an amended complaint. (Docket 26). Count I of the amended complaint alleges DSS violated Title VII by individual race discrimination against Cedric Goodman, a Native American, and other similarly situated Native Americans by denying them, because of their race, employment as a Specialist[1] at the DSS Office at Pine Ridge, South Dakota, during 2007 through 2013. Id. at pp. 4-7. Count II of the amended complaint alleges DSS violated Title VII by engaging in a pattern or practice of intentional discrimination against Native Americans by denying them, because of their race, employment as a Specialist at the DSS Pine Ridge Office during 2007 through 2013. Id. at pp. 4-7 & 9.

---

[1]The Pine Ridge DSS Office has three positions which are the focus of this litigation: Employment Specialists, Economic Assistance Benefits Specialists ("Benefits Specialist") and Adult Services and Aging Specialists ("ASA Specialist"). See Dockets 26 at page 2 and Docket 43 at p. 2. Collectively referred to as "Specialist."

DSS denied it discriminated either against individual Native American applicants for a Specialist position or through a pattern or practice of racial discrimination. (Docket 27). Among other defenses, DSS asserted with respect to Mr. Goodman, and all other allegedly similar applicants, its "policies, practices and decisions . . . were at all times based on legitimate, nondiscriminatory business reasons." Id. at p. 8. DSS further alleged its "actions . . . were at all times reasonable and undertaken in good faith and consistent with applicable statutes and enforceable regulations." Id. at pp. 8-9.

The court bifurcated discovery into two stages. (Docket 16 at p.1). The first stage focused "on (a) the liability, if any, of the [DSS] for the plaintiff's pattern-or-practice claim; (b) any defenses asserted by DSS that apply to the issues to be tried in Stage I; and (c) the relief, if any, including prospective injunctive relief ordered by the court on that claim." Id. A subsequent order modified the discovery timetable and established a deadline for submission of Stage I motions. (Docket 40).

DSS's motion for summary judgment asserts the United States "cannot meet its burden to show a prima facie case that DSS intentionally engaged in a pattern-or-practice of discrimination." (Docket 41 at p. 1). The United States moves for "partial summary judgment on its *prima facie* case that [DSS] engaged in a pattern or practice of intentional discrimination against Native Americans when hiring Specialists at its Pine Ridge office from 2007 through

2013." (Docker 45 at p. 1). Both of the parties' motions for summary judgment will be separately addressed.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at p. 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323

4

(1986).   In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Id. at p. 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).   The court is permitted to assume facts as true so long as they are not blatantly contradicted by the record and make all reasonable inferences in favor of the non-moving party regarding any unresolved factual questions.   Brown v. Fortner, 518 F.3d 552, 557-58 (8th Cir. 2008).   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at pp. 251-52.

## TITLE VII

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1).   "All disparate-treatment claims brought under Title VII turn on one basic issue: whether the employer intentionally treated 'some people less favorably than others because of their race, color,

religion, sex, or national origin.'" <u>Craik v. Minnesota State University Board</u>, 731 F.2d 465, 468-69 (8th Cir. 1984) (citing <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 335 n.15 (1977)). As indicated above, Stage I of the case only addresses the pattern or practice claim of the United States. For plaintiff's pattern or practice disparate treatment claims, the court employs the burden-shifting framework outlined in <u>Teamsters</u>. "The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer. . . ." <u>Teamsters</u>, 431 U.S. at 360. "At the initial, 'liability' stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." <u>Id.</u> "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." <u>Craik</u>, 731 F.2d at 469.

"Normally, the plaintiff will produce statistical evidence showing disparities between similarly situated protected and unprotected employees with respect to hiring . . . supplemented with other evidence, such as testimony about specific incidents of discrimination." <u>Craik</u>, 731 F.2d at 470. "[B]ecause it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately [has] to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory

6

acts.   It had to establish by a preponderance of the evidence that racial discrimination was the [defendant's] standard operating procedure the regular rather than the unusual practice."  Teamsters, 431 U.S. at 336.   "[I]t [is] unmistakably clear that '(s)tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue."  Id. at 339 (citing Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620 (1974)).   Statistics are competent evidence for proving employment discrimination.   Id.   In recognizing this evidentiary option, the Supreme Court "caution[ed] only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted.   In short, their usefulness depends on all of the surrounding facts and circumstances."  Id. at 340.

"To be legally sufficient, the [government's] statistical evidence 'must show a disparity of treatment, eliminate the most common nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other explanation, the disparity more likely than not resulted from illegal discrimination.' "  Morgan v. United Parcel Service of America, Inc., 380 F.3d 459, 463-64 (8th Cir. 2004) (citing Hervey v. Little Rock, 787 F.2d 1223, 1228 (8th Cir. 1986) (internal quotation omitted).   "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  Hazelwood School District v. United States, 433 U.S. 299, 307-08 (1977).   The government's

evidence of individual intentional discrimination may be considered to supplement plaintiff's statistical evidence as anecdotal "evidence would bring the cold numbers convincingly to life." Morgan, 380 F.3d at 471 (citing Teamsters, 431 U.S. at 339).

If the government makes out a prima facie case, "[t]he burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. An employer might show, for example, . . . that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination." Teamsters, 431 U.S. at 360. "The defendant, in rebuttal, will attempt to show that the plaintiff's 'proof is either inaccurate or insignificant.' " Craik, 731 F.2d at 470 (citing Teamsters, 431 U.S. at 360).

"If the defendant satisfies its burden of production, the trier of fact must then determine, by a preponderance of the evidence, whether the employer engaged in a pattern or practice of intentional discrimination." Reynolds v. Barrett, 685 F.3d 193, 203 (2d Cir. 2012). "If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief." Teamsters, 431 U.S. at 361.

## UNDISPUTED MATERIAL FACTS RELATED TO BOTH MOTIONS

Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document. For purposes of resolving both parties' motions for summary judgment, the following material facts are undisputed.

DSS is a governmental agency created pursuant to the laws of the state of South Dakota. (Docket 26 at p. 2). DSS has offices throughout South Dakota, including an office on the Pine Ridge Reservation, which primarily serves Native Americans living on the reservation. Id. The Pine Ridge Reservation is home to the Oglala Lakota Sioux Tribe. (Docket 47 ¶ 1). About 90 percent of the Reservation's population self-identified as Native American in the 2010 decennial census and most of the residents are members of the Tribe. Id.

The DSS Pine Ridge Office has approximately thirty to forty staff members at a given time, including the regional manager, supervisors, lead Benefits Specialist, Benefits Specialists, Employments Specialists, ASA Specialists, and clerical positions such as secretaries. (Docket 49 ¶ 12). Each Specialist reports to a supervisor. Id. ¶ 24. During the relevant time period, the DSS Pine Ridge Office had one Supervisor of Employment Specialists, one Supervisor of ASA Specialists, and two Supervisors of Benefits Specialists. Id.

Each supervisor reports to a regional manager. Id. ¶ 32. There are two regional managers with management responsibilities for the DSS Pine Ridge Office. Id. The regional manager for the Division of Economic Assistance ("DEA Regional Manager") oversees the Employment Specialist Supervisor and the Benefits Specialist Supervisor, along with the Employment Specialists and Benefits Specialists. Id.

A Benefits Specialist processes a client's data to determine eligibility for government assistance programs such as the Supplemental Nutrition Assistance Program ("SNAP"), Electronic Benefits Transfers ("EBT"), Medicaid, and refers qualified clients to the Temporary Assistance for Needy Families ("TANF") program. Id. ¶ 15. A Benefits Specialist is primarily engaged in interviewing clients to obtain the requisite information needed to determine eligibility, but visits homebound clients to understand their household. Id. ¶ 16; see also Docket 55 ¶ 16.

An Employment Specialist primarily administers the conditions of the TANF program. That program requires individuals to spend approximately twenty hours a week attempting to find employment, obtaining further education, or performing community service. (Docket 49 ¶ 17). An Employment Specialist also attempts to find employment and educational opportunities for TANF recipients. Id. ¶ 18. Employment Specialists meet with clients applying for TANF to identify barriers to employment, and then through referrals, counseling, and other processes, help the individual to

address those barriers.  Id. ¶ 19.  Field work was a substantial portion of an Employment Specialist's job duties.  Id. ¶ 20.

An ASA Specialist determines eligibility for in-home services primarily to the elderly, with the goal of keeping individuals in their home communities for as long as possible to avoid nursing home placement.  Id. ¶ 21.  Eligibility for ASA services is based on age and income.  Id. ¶ 22.  An ASA Specialist spends substantial time in the field performing in-home visits, delivering equipment and doing in-person eligibility assessments.  Id. ¶ 23.

Jim Treloar was the DEA Regional Manager from 2003 until October 2015.  Id. ¶ 33.  Keith Kearns was the Employment Specialist Supervisor from 1999 to October 2015.  Id. ¶ 25.  Mr. Kearns replaced Mr. Treloar and remains the DEA Regional Manager.  Id. ¶ 34.

Cheryl White was a Benefits Specialist Supervisor from 2004 until her retirement in November 2013.  Id. ¶ 26.  Ms. White was replaced by Rhonda Barker, who remains a Benefit Specialist Supervisor.  Id. ¶ 27.  Ron Shedeed was a Benefits Specialist Supervisor from the mid-1990's until his retirement in 2009.  Id. ¶ 29.  Michael Bakley replaced Mr. Shedeed and has been a Benefits Specialist Supervisor since 2010.  Id. ¶¶ 28-29.

The Regional Manager for the Division of Adult Services and Aging ("DASA Regional Manager") oversees the ASA Specialist Supervisor and the ASA Specialists.  Id. ¶ 35.  Tammy Kabris was the DASA Regional Manager from 2011 until 2015.  Id.  Nancy Sletto was the ASA Specialist Supervisor from

the mid-2000s until 2010. Id. ¶ 30. Rogine Page replaced Ms. Sletto and has been the ASA Specialist Supervisor since July 2011. Id. ¶ 31.

Normally there are a static number of Specialist positions at the DSS Pine Ridge Office and the opportunity to hire a new employee only arises when a vacancy in an existing Specialist position occurs. Id. ¶ 36. When a vacancy occurs the supervisor of that position (the "Hiring Supervisor") informs the regional manager and prepares a requisition request asking that the position be advertised. Id. ¶ 37. DSS assigns each requisition a unique number. (Docket 47 ¶ 13). The requisition includes the job title, the position number, to whom the requisition list should be sent, whether the position was full-time or part-time, a description of an ideal candidate, a description of the knowledge, skills and abilities ("KSA's") being sought and a list of any additional requirement questions. (Docket 49 ¶ 38). This information is incorporated into the formal job posting which includes a description of the position, the ideal candidate, the required KSA's and any supplemental questions. Id. ¶ 39.

Job postings are advertised through the South Dakota Bureau of Human Resources ("BHR"), formerly the South Dakota Bureau of Personnel. Id. ¶ 40. Application materials are available online for viewing and printing. Id. ¶ 42. A candidate applying for a DSS position submits all application materials electronically to BHR. Id. ¶¶ 41 & 42.

After a position is advertised, the Hiring Supervisor receives a certification list and has access through BHR's online system to the job candidates' application materials and supporting materials.[2] Id. ¶¶ 43-45. The Hiring Supervisor considers an applicant's materials in light of the KSA's and preferred qualifications of higher education, prior case management experience, and familiarity with the geography and culture of the Pine Ridge Reservation, to determine those qualified for an interview. Id. ¶ 48; see also Docket 55 ¶ 48. Depending on the number of applicants, a Hiring Supervisor will conduct initial phone interviews to screen out applicants. (Docket 49 ¶ 46). If a smaller applicant pool is involved, the Hiring Supervisor may conduct only in-person interviews. Id. ¶ 47.

In-person interviews are conducted by the Hiring Supervisor with assistance from another supervisor and occasionally the regional manager. Id. ¶ 49. The Hiring Supervisor creates a list of questions and the interviewers rotate through the questions with the applicant. Id. ¶ 50. The same questions are asked of each interviewee in a given requisition, with the interviewers asking follow-up questions which varied from interview to interview. Id. ¶ 51; see also Docket 55 ¶ 51.

After reviewing the application, completing interviews and completing reference checks, if there was no applicant the Hiring Supervisor felt

---

[2]All of the hiring forms such as requisition requests, certification lists and reference check forms were created and maintained by BHR. (Docket 49 ¶ 56).

comfortable recommending for hire, the Hiring Supervisor has the discretion to have BHR cancel a requisition and re-advertise the position.[3]   (Dockets 49 ¶ 52 & 55 ¶ 52).   If the Hiring Supervisor finds a qualified applicant who had a successful interview and reference check, the applicant is recommended to the Regional Manager for hire.[4]   (Docket 49 ¶ 53).   The Regional Manager sends the final selection to the Division Director who passes the selection onto BHR for final approval.   Id. ¶ 54.   While additional clarifications regarding salary or requests for information are occasionally requested by the Division Director, there is no evidence a Hiring Supervisor's recommendation was ever rejected. Id. ¶ 55.

From January 1, 2007 to December 31, 2013, the DSS Pine Ridge Office hired twenty white applicants and two Native American applicants as Specialists.   (Dockets 49 ¶ 58 & 55 ¶ 58).   During the same time period, the DSS Pine Ridge Office posted 35 open and competitive requisitions for Specialist positions.[5]   Id.

---

[3]The United States disputes the reasons behind the decisions of the Hiring Supervisors to cancel fifteen requisitions from 2007 through 2014. (Docket 55 ¶ 52).

[4]The United States disputes the reasons behind the Hiring Supervisors' recommendations for hire from 2007 through 2013.   (Docket 55 ¶ 53).

[5]The United States originally alleged there were 38 positions posted, but later learned two of those positions were internal promotional opportunities which were not open to the general public.   (Docket 55 ¶ 58).   Those two positions are excluded from the remainder of the analysis.   Id.

DSS's applicant-flow data for each requisition includes a list of all applicants with each applicant's self-identified racial classification and each applicant's individual status disposition for that requisition.  Id.  DSS maintains its applicant-flow data with the BHR.  (Docket 47 ¶ 35).

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In addition to the facts stated above, for purposes of addressing defendant's motion for summary judgment the following recitation consists of the material facts developed from the defendant's statement of undisputed material facts (Docket 49), plaintiff's response to defendant's statement of undisputed facts (Docket 55), and other evidence where indicated.  Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document.  These facts are "viewed in the light most favorable to the [party] opposing the motion."  Matsushita Elec. Indus. Co., 475 U.S. at 587.

UNDISPUTED MATERIAL FACTS

In addition to the facts stated above, the undisputed facts pertinent to defendant's motion for summary judgment are as follows.  In 2010-11, DSS maintained 64 offices within nearly every county in South Dakota.[6]  (Docket 49 ¶ 4).  Of those 64 offices, 35 were full-time offices and 29 were itinerant

_____

[6]The United States does not dispute the state-wide data of DSS, but asserts the data is "immaterial to the claims and timeframe in this case." (Docket 55 ¶ 4; see also id. ¶¶ 5-9).

offices staffed for a few days each week or month.  Id.  In 2010, DSS employed

535 Specialists statewide.  Id. ¶ 6.  In 2010, DSS hired 234 new employees,

including 37 new Specialists, statewide.  Id. ¶ 8.  In 2011, DSS had over

1,800 employees statewide and employed 516 Specialists.  Id. ¶¶ 5 & 7.  In

2011, DSS hired 285 new employees statewide including 44 new Specialists.

Id. ¶ 9.

Prior to 2014, the individual Hiring Supervisors at the DSS Pine Ridge

Office had discretion to conduct interviews and hiring in a non-uniform way.

(Docket 55 ¶ 57).  The Specialist hiring criteria was individualized to

include non-statewide criteria, such as familiarity with the Native American

culture.  Id.

"Statistical significance tests are used to decide whether a disparity,

such as a disparity between the hiring rates of two groups (*e.g.*, Native

American applicants and white applicants), is or is not likely due to normally-

occurring chance variation."  (Docket 47 ¶ 59).  "A disparity can be described

in terms of standard deviations, which correspond to the likelihood that an

observed disparity at least as large as the one obtained would occur by chance.

For example, a 5% likelihood equates to slightly less than two (1.96) units of

standard deviation."  Id. ¶ 60.  "Statisticians and other social scientists

normally consider a disparity to be 'statistically significant' if there is a 5% or

lower likelihood (*i.e.*, probability) that so large a disparity would occur by chance."[7]  Id. ¶ 61.

The United States disclosed an expert report by Dr. Juliet Aiken to present a statistical analysis of the differences in hiring rates between Native American and white applicants for Specialist positions at the DSS Pine Ridge Office.[8]  (Docket 49 ¶ 62).  Dr. Aiken separated her analyses into three periods: (1) 2005-06; (2) 2007-13 (Pre-Competency); and (3) 2014-15 (Post-Competency).  Id. ¶ 63.  Dr. Aiken combined her statistical analyses of the three Specialist positions and concluded the difference in hiring rates was statistically significant, 3.47 standard deviations, for the Specialist positions in 2007-13.  Id. ¶ 64.  Dr. Aiken concluded the disparity was practically significant, projecting that if DSS had hired Native Americans at the same rate as all applicants, the DSS Pine Ridge Office would have hired eight more Native Americans as Specialists during the period of 2007-13.  Id. ¶ 65.

---

[7]"Statistical significance is a measure of the probability that an observed disparity is not due to chance. . . . A finding that a disparity is statistically significant at the 0.05 or 0.01 level means that there is a 5 per cent. or 1 per cent. probability, respectively, that the disparity is due to chance."  Craik, 731 F.2d at 476 n.13 (internal citation omitted).

[8]Dr. Aiken holds a Ph.D. and M.S. in Industrial/Organizational Psychology with a Certificate in Measurement, Statistics, and Evaluation from the University of Maryland and is the Program Director and Assistant Clinical Professor for the Masters of Professional Studies in the Industrial Organizational Psychology program at the University of Maryland College Park. (Docket 47 ¶ 24).

DSS disclosed an expert report from Dr. Janet Thornton in which she identified a number of criticisms of Dr. Aiken's report.   (Docket 49 ¶ 66).   In both her report and in her deposition testimony, Dr. Thornton acknowledged there were statistically significant differences in the Native American composition of the offers extended to those interviewed for the Benefits Specialist position from 2007 through 2013.   (Docket 55 ¶ 67).

ANALYSIS

DSS's motion for summary judgment asserts the United States "cannot make a prima facie showing of an intentional pattern-or-practice of discrimination, because the Plaintiff's evidence is limited to one of the sixty-four DSS offices in South Dakota and, within that one office, is further limited to only three positions."   (Docket 43 at p. 11).   DSS argues "the discriminatory policy must be the 'company's standard operating procedure rather than the unusual practice.' "   Id. (citing Teamsters, 431 U.S. at 336).   DSS contends the case law requires a finding of "company-wide discrimination" before a pattern or practice can be established.   Id. at p. 12 (citations omitted). Defendant submits the decision of "Wal-Mart Stores, Inc. v. Dukes, [564 U.S. 338 (2011)] is instructive on this point."   Id.   DSS argues because the United States "limit[s] its statistical evidence to a single DSS Office . . . [and] further limits its statistical evidence to three positions. . . . [The United States] cannot establish that DSS operates under a 'general policy of discrimination.' "   Id. at p. 13 (citing Dukes, 564 U.S. at 358).

18

The United States contends that "DSS's argument that a pattern or practice of discrimination must permeate every corner of an organization to be actionable evinces a basic misunderstanding of Title VII . . . ."  (Docket 53 at p. 3).   The government argues "pattern-or-practice disparate treatment claims . . . must be brought . . . to remedy 'repeated, routine, or . . . generalized' discrimination with systemic relief."  Id. at p. 7 (referencing Teamsters, 431 U.S. at 336 n.16; other citations omitted).   Plaintiff submits that "[a]s an imperfect shorthand, courts sometimes refer to [this] as 'company-wide' discrimination."  Id. (referencing EEOC v. Tricore Reference Laboratories, 849 F.3d 929, 937 (10th Cir. 2017) ("A plaintiff may state a claim of company-wide discrimination by showing that an employer has a pattern or practice of discrimination. . . . The claim requires proof that the employer had a regular practice of discrimination—'more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts.' ") (citing Teamsters, 431 U.S. at 336).   The United States argues "DSS relies on courts' use of the phrase 'company-wide' to import an entirely novel – and fatally flawed – requirement to pattern-or-practice cases."  Id.   Plaintiff asserts "according to DSS's reasoning, it would not violate Title VII to condone rampant discrimination by managers in one department so long as not all managers in all other departments engaged in discrimination.   This bald attempt to severely limit the protections offered by Title VII must be rejected."  Id.

Courts permit an examination of discrimination both company-wide, within one or more facilities or within a single department of a business. See Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 877-78 (1984) (Recognizing a valid Title VII claim may exist if the plaintiff shows a "consistent practice within a given department."); Brown v. Nucor Corp., 785 F.3d 895, 898 (4th Cir. 2015) (Title VII discrimination claims at a single steel plant of the 22 plants owned nationwide by Nucor Corporation);[9] Phipps v. Wal-Mart Stores, Inc., 792 F.3d 637, 642 (6th Cir. 2015) (post-Dukes [564 U.S. 338] plaintiffs are entitled to pursue Title VII pattern or practice claims against Wal-Mart in four regional stores in California); E.E.O.C. v. Dial Corp., 469 F.3d 735, 739 (8th Cir. 2006) (Title VII claims are permitted against a single Iowa plant of an international company).

Defendant's reliance on E.E.O.C. v. Mitsubishi Motor Manufacturing of America, Inc., 990 F. Supp. 1059 (C.D. Ill. 1998), is misplaced. The case is logically in line with the cases referenced above addressing Title VII claims.

> The sexual harassment need not occur in the auto assembly plant, as a whole, to be actionable in a pattern or practice case; rather, if the alleged harassment is only occurring in one or two areas of the plant, then those areas will be the relevant populations examined for purposes of determining whether or not there was a severe and pervasive problem of sexual harassment within the plant. To do otherwise would effectively mean that Title VII did not apply to those unlucky enough to work in the areas in which the alleged harassment was occurring, simply because this harassment was not

---

[9] See also brief of appellees in Brown v. Nucor Corp., No. 13-1779, 2013 WL 6061283, at *5 (4th Cir. Nov. 18, 2013) ("Nucor is a Fortune 500 company; the company and its affiliates employ over 8,000 people in 22 steel plants nationwide.").

occurring every place else. Such a requirement is not consistent with Title VII, nor does it appear to be required by the United States Supreme Court.

Id. at 1075 n.8 (referencing Teamsters, 431 U.S. at 336 n.16).

The United States is not compelled to present a pattern or practice of discrimination permeating all 64 statewide offices of DSS to pursue the Title VII claim in this case. Cooper, 467 U.S. at 877-78; Brown, 785 F.3d at 898; Dial Corp., 469 F.3d at 739; Phipps, 792 F.3d at 642; and Mitsubishi Motor Mfg. of Am., Inc., 990 F. Supp. at 1075.

At this juncture and solely analyzing the defendant's motion for summary judgment, the court finds DSS in not entitled to judgment as a matter of law. Even though DSS challenges the veracity of the government's statistical evidence, the defendant acknowledges the evidence supports the government's burden to establish a prima facia case that a discriminatory pattern or practice existed in the DSS Pine Ridge Office for the positions of Specialist. (Docket 49 ¶¶ 62-65). "At the initial, 'liability' stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." Teamsters, 431 U.S. at 360.

Defendant's motion for summary judgment is denied.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

In addition to the undisputed material facts related to both motions set forth earlier in this order, for purposes of addressing plaintiff's motion for summary judgment the following recitation consists of the material facts developed from the amended complaint (Docket 26), defendant's answer (Docket 27), plaintiff's statement of undisputed material facts (Docket 47), defendant's response to plaintiff's statement of undisputed facts (Docket 50),[10] and other evidence where indicated. Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document. These facts are "viewed in the light most favorable to the [party] opposing the motion." Matsushita Elec. Indus. Co., 475 U.S. at 587.

UNDISPUTED MATERIAL FACTS

The following additional undisputed material facts specifically relate to plaintiff's motion for partial summary judgment. All of the following statistical data relates to the DSS Pine Ridge Office for the 2007 through 2013 time period, unless otherwise specified. For the 35 requisitions, Native American applicants submitted 213 (44.5%) complete applications and white applicants submitted 265 (55.5%) complete applications.[11] (Docket 47 ¶ 42). One

---

[10]DSS contends that its "decision not to dispute a particular statement of fact should not be construed as an admission that the statement is true *per se*." (Docket 50 at p. 1). This caveat is contrary to the specific requirements of Fed. R. Civ. P. 56(c) & (d) and D.S.D. Civ. LR 56.1(B).

[11]Many applicants submitted applications for more than one requisition from 2007 through 2013. (Docket 47 ¶ 43).

hundred eighty-six Native American applicants and 228 white applicants submitted complete applications and did not withdraw from the hiring process. Id. ¶ 45.   DSS offered interviews to 117 (46.1%) Native American applicants and 137 (53.9%) white applicants.   Id. ¶ 46.   DSS conducted interviews with 90 Native Americans and 100 white applicants.   Id. ¶ 47.   DSS offered Specialist jobs to 22 interviewees, 20 of whom (90.9%) were white and only two of whom (9.1%) were Native American.   Id. ¶ 48.

DSS offered to hire zero Native Americans in 2007 through 2010, and 2012, despite seeking to hire Specialists on 22 separate occasions.   Id. ¶ 49. During 2007 through 2010, DSS offered to hire zero Native Americans while offering to hire 12 white applicants as Specialists.   Id. ¶ 50.   In 2011, DSS offered to hire one Specialist who was Native American and two white applicants as Specialists.   Id. ¶ 51.   In 2012, DSS offered to hire zero Native Americans while offering to hire three white applicants as Specialists.   Id. ¶ 52.   In 2013, DSS offered to hire one Specialist who was Native American and three Specialists who were white.   Id. ¶ 53.

To perform her analysis, Dr. Aiken aggregated the data for all Specialist positions posted between 2007 and 2013.   Id. ¶ 63.   She aggregated the data because the positions had the same hiring process and the statistical tests indicated that aggregation was appropriate.   Id.   Dr. Aiken found DSS offered to hire two (1.1%) of the 186 Native American applicants and offered to hire 20 (8.8%) of the 228 white applicants who submitted complete applications and

did not withdraw from the hiring process.   Id. ¶¶ 64-65.   Dr. Aiken concluded

the hiring difference favoring white applicants was statistically significant,

equivalent to 3.47 units of standard deviation.[12]   Id. ¶ 66.   Dr. Aiken

concluded the hiring difference favoring white interviewees was statistically

significant, equivalent to 3.82 units of standard deviation.[13]   Id. ¶ 74.   Dr.

Aiken concluded the ratio of the hiring rates for Native American interviewees

and white interviewees was practically significant.[14]   Id. ¶ 76.

Dr. Aiken determined if DSS hired Native American applicants at a rate

equal to 80 percent of the hiring rate for white applicants, DSS would have

hired an additional eleven Native American applicants.   Id. ¶ 68.   She further

concluded if DSS hired Native Americans at the 5.3 percent overall rate of hire,

across all applicants grouped together, DSS would have hired an additional

eight Native American applicants.   Id.

---

[12]Dr. Aiken concluded there was no statistically or practically significant
difference in the rates of Native American and white applicants who were
invited to interview.   (Docket 47 ¶ 71).

[13]DSS does not dispute this finding, but asserts a clarification is
necessary: "Dr. Aiken concluded that the hiring difference favoring white
interviewees was equivalent to 3.82 units of standard deviation in the
interview-to-offer analyses, but was 3.47 units of standard deviation in the
bottom-line analyses."   (Docket 50 ¶ 74) (referencing Docket 47-6 at p. 11)
(DSS mistakenly referred to Docket 47-6 at p. 10).   See also Dockets 44-22 at
p. 11 & 47 ¶ 66.

[14]"Practical significance" is also described as the 80 percent rule.   "A
selection rate for any race . . . which is less than four-fifths (4/5) (or eighty
percent) of the rate for the group with the highest rate will generally be
regarded by the Federal enforcement agencies as evidence of adverse impact
. . . ."   29 CFR ¶ 1607.4(D).   See also Docket 47-6 at p. 5.

Dr. Thornton's analysis of the applicant-flow data examined whether there was a statistically significant difference between the actual and predicted number of Native American interviews and hire offers.  Id. ¶ 83.   She testified her approach for calculating statistical significance and Dr. Aiken's approach for calculating statistical significance would "come to the same or similar conclusions."  Id. ¶ 84.   Dr. Thornton admits there was a statistically significant difference between the actual and predicted number of Native American offers for the Benefits Specialist position when aggregated from 2007 through 2013, but that it was not appropriate to aggregate the data over seven years.  Id. ¶ 85; see also Docket 50 ¶ 85.

The United States identified as its Stage I witnesses twenty-six Native American "class members" who applied for Specialist positions at the DSS Pine Ridge office.[15]   (Docket 49 ¶ 61).   In addition to the pattern or policy evidence, the United States presents the following undisputed material facts associated with the qualifications of specific Native American applicants.   The evidence associated with those nine applicants during the time period 2007 through 2013 is the following.

---

[15]The United States makes no allegations regarding DSS's hiring practices at its other offices across the state of South Dakota and does not make any allegations regarding non-Specialist positions at the DSS Pine Ridge office.   (Docket 49 ¶ 60).

T.R.

T.R. applied to be a Specialist with the DSS Pine Ridge Office (hereinafter "DSS") three times. (Docket 47 ¶ 86). She identified herself as a Native American in all three of her applications. Id. ¶¶ 86, 89 & 91).

She applied to be a Benefits Specialist in Requisition 80602. Id. ¶ 86. DSS interviewed and rejected T.R. for the position. Id. DSS cancelled Requisition 80602 without a hire. Id. ¶ 88.

T.R. applied to be an Employment Specialist in Requisition 80630. Id. ¶ 89. DSS interviewed and rejected her for the position. Id. DSS cancelled Requisition 80630 without a hire. Id.

T.R. applied to be an Employment Specialist in Requisition 101282. Id. ¶ 91. DSS interviewed T.R. and rejected her for the position. Id. ¶ 92.

Mr. Kearns was the hiring supervisor for Requisitions 80630 and 101282. Id. ¶ 93. He agreed that based on the fact T.R. was interviewed, she had the three criteria he was looking for, those being education, work experience and familiarity with Native American culture. Id. ¶ 94.

S.C.R.

S.C.R. applied to be a Specialist with DSS three times. Id. ¶ 95. She identified herself as Native American in all three applications. Id. ¶¶ 96, 98 & 100.

S.C.R. applied to be an Employment Specialist in Requisition 100028
<u>Id.</u> ¶ 96.   She was not invited to interview for that position.   <u>Id.</u>   DSS hired
D.A., a white applicant, for the position.   <u>Id.</u> ¶ 97.

S.C.R. applied to be an Employment Specialist in Requisition 100570.
<u>Id.</u> ¶ 98.   DSS interviewed and rejected her for the position.   <u>Id.</u>   Requisition
100570 was cancelled without a hire.[16]   <u>Id.</u> ¶ 99.

Mr. Kearns was the hiring supervisor for Requisitions 100028 and
100570.   <u>Id.</u> ¶ 102.   When asked whether S.C.R. "met the qualifications for
the Employment Specialist position," Mr. Kearns responded "her education and
experience does reach that level . . . ."   <u>Id.</u> ¶¶ 104 (brackets omitted) & Docket
50 ¶ 104.

S.C.R. applied to be a Benefits Specialist in Requisition 100573.
(Docket 47 ¶ 100).   Ms. White was the hiring supervisor for Requisition
100573.   <u>Id.</u> ¶ 103.   Ms. White testified S.C.R. appeared qualified for an
interview.   <u>Id.</u> ¶ 105.   DSS interviewed and rejected S.C.R. for the position.
<u>Id.</u> ¶ 100.   Requisition 100573 was cancelled without a hire.[17]   <u>Id.</u> ¶ 101.

---

[16]Requisition 100925 was opened to fill the same employment position
proposed in Requisition 100570.   (Docket 99).   The United States does not
disclose the ultimate resolution of Requisition 100925.

[17]Requisition 100924 was opened to fill the same employment position
proposed in Requisition 100573.   (Docket 47 ¶ 101).   The United States does
not disclose the ultimate resolution of Requisition 100924.

A.B.B.

A.B.B. applied to be a Specialist with DSS three times.   Id. ¶ 106.   She

identified herself as a Native American in all three of her applications.   Id.

¶¶ 107-09.

A.B.B. applied to be an Employment Specialist in Requisition 100570.

Id. ¶ 107.   DSS interviewed and rejected her for the position.   Id.

A.B.B. applied to be an Employment Specialist in Requisition 100573.

Id. ¶ 108.   She was not invited to interview for the position.   Id.

A.B.B. applied to be an Employment Specialist in Requisition 101107.

Id. ¶ 109.   DSS interviewed A.B.B. and rejected her for the position.   Id.

Requisition 101107 was cancelled without a hire.[18]   Id. ¶ 110.

Mr. Kearns was the hiring supervisor for Requisition 100570 and

Requisition 101107.   Id. ¶ 111.   He agreed A.B.B. must have met the

minimum qualifications for the positions of Requisitions 100570 and 101107 as

he offered her interviews.   Id. ¶ 112.

D.A.S.

D.A.S., formerly D.A., applied once to be an ASA Specialist with DSS in

Requisition 70184.   Id. ¶¶ 113-14.   She identified herself as a Native

American in her application.   Id. ¶ 114.

---

[18]Requisition 101282 was opened to fill the same employment position
proposed in Requisition 101107.   (Docket 47 ¶ 110).   T.R. interviewed for
Requisition 101282, but was rejected for the position.   Id. ¶ 91.   The United
States does not disclose the ultimate resolution of Requisition 101282.

Ms. Sletto was the hiring supervisor for Requisition 70184.   Id. ¶ 116.

D.A.S. was interviewed because Ms. Sletto "thought [D.A.S.] was among the

group that was the best qualified that we had."   Id. ¶ 117.   DSS rejected

D.A.S. for the position.   Id. ¶ 113.   A white applicant, L.H., was hired for the

position.   Id. ¶ 115.

D.B.L.

D.B.L. applied to be a Benefits Specialist once with DSS in Requisition

1384.   Id. ¶¶ 118-19; see also Docket 47-4 at p. 15.   She identified herself as

a Native American in her application.   (Docket 47 ¶ 119).

Mr. Bakley was the hiring supervisor for Requisition 1384.   Id. ¶ 121.

Mr. Bakley testified D.B.L. "was qualified to the point I wanted to know more in

an interview."   Id. ¶¶ 122 & Docket 50 ¶ 122.   D.B.L. was interviewed for

Requisition 1384, but was rejected for the position.   (Docket 47 ¶ 119).   DSS

hired B.G., a white applicant, for the position.   Id. ¶ 120.

S.L.

S.L. applied to be a Specialist with DSS three times.   Id. ¶ 123.   She

identified herself as a Native American in all three of her applications.   Id.

¶¶ 124-25 & 127.

S.L. applied to be an Employment Specialist in Requisition 100028.   Id.

¶ 124.   DSS did not invite her to interview for the position.   Id.   Mr. Kearns

was the hiring supervisor for the requisition.   Id. ¶ 129.   He hired D.A., a

white applicant, for the position.   Id. ¶ 97 & 129.   Mr. Kearns agreed S.L.'s

casework experience qualifications exceeded the experience of the white applicant in terms of "the type of experience." <u>Id.</u> ¶ 131 (brackets omitted). He acknowledged that S.L.'s education exceeded the white applicant's education. <u>Id.</u> ¶ 132.

S.L. applied to be an ASA Specialist in Requisition 101685. <u>Id.</u> ¶ 125. She was interviewed but not hired for the position. <u>Id.</u> DSS hired J.M., a white applicant, for the position. <u>Id.</u> ¶ 126.

S.L. applied to be an ASA Specialist in Requisition 101692. <u>Id.</u> ¶ 127. She was interviewed but not hired for the position. <u>Id.</u> DSS hired J.W., a white applicant, for the position. <u>Id.</u> ¶ 128.

A Regional Manager, Ms. Kabris was on the interview panels for Requisitions 101685 and 101692. <u>Id.</u> ¶ 130. She agreed S.L. met the minimum qualifications for the ASA Specialist position advertised in Requisition 101692. <u>Id.</u> ¶¶ 133 & Docket 50 ¶ 133.

<u>R.A.D.</u>

R.A.D., formerly A.N., twice applied to be a Specialist with DSS. (Docket 47 ¶ 134). She applied for a position as a Benefits Specialist in Requisition 102292. <u>Id.</u> ¶ 135. She identified as a Native American in this requisition. <u>Id.</u> Ms. White was the hiring supervisor for this requisition. <u>Id.</u> ¶ 139. She testified R.A.D. "must have met the qualifications for the position" to be interviewed. <u>Id.</u> ¶ 142. DSS interviewed R.A.D. but she was rejected for the

position.  Id. ¶ 135.  J.S., a white applicant, was hired for the position.  Id. ¶ 136.

R.A.D. applied to be an Employment Specialist in Requisition 2022.  Id. ¶ 137.  She did not provide a racial self-identification for this requisition.  Id. Mr. Kearns was the hiring supervisor for Requisition 2022.  Id. ¶ 140.  He testified R.A.D. met his criteria for an interview based on her master's degree, her casework experience and her familiarity with Native American culture.  Id. ¶ 143. DSS interviewed R.A.D. for Requisition 2022 but she was rejected for the position.[19]  Id.

The Regional Manager, Mr. Treloar, was on the interview panel for both Requisitions 102292 and 2022.  Id. ¶ 141.  He testified R.A.D. was "a strong candidate" based on her Master's Degree in social work and her background that included casework.  Id. ¶ 144.

R.W.H.

R.W.H. applied four times to be a Specialist with DSS.  Id. ¶ 145.  She identified herself as a Native American on all four applications.  Id. ¶¶ 146-7, 149 & 151.

R.W.H. applied to be an Employment Specialist in Requisition 80838. Id. ¶ 146.  DSS marked her application as "too late."  Id.

_____

[19]Requisition 2182 was opened to fill the same employment position proposed in Requisition 2022.  (Docket 47 ¶ 138).  The United States does not disclose the ultimate resolution of Requisition 2182.

R.W.H. applied to be a Benefits Specialist in Requisition 80867.   Id. ¶ 147.
Ms. White was the hiring supervisor for this requisition.   Id. ¶ 152.   She testified
R.W.H. was qualified for the position.   Id. ¶ 153.   DSS interviewed and
rejected R.W.H. for the position.   Id.   DSS cancelled Requisition 80867 without
a hire.[20]   Id. 148.

R.W.H. applied to be a Benefits Specialist in Requisition 90014.   Id. ¶ 149.
Ms. White was the hiring supervisor for this requisition.   Id. ¶ 152.   She testified
R.W.H. was qualified for the position.   Id.   DSS interviewed and rejected
R.W.H. for the position.   Id.   T.B., a white applicant, was hired to fill the
position.   Id. ¶ 150.

R.W.H. applied to be a Benefits Specialist in Requisition 534.   Id. ¶ 151.
DSS marked her disposition as "failing to comply."   Id.

I.R.C.

I.R.C., formerly I.S., applied nine times to be a Specialist with DSS.   Id.
¶ 154.   She identified herself as a Native American in eight of her applications.
Id. ¶¶ 155-56, 158, 160, 162-65.

I.R.C. applied to be an ASA Specialist in Requisition 70184.   Id. ¶ 155.
Ms. Sletto was the hiring supervisor for this requisition.   Id. ¶ 167.   Ms. Sletto
agreed I.R.C., "had three of the primary criteria that Ms. Sletto was looking
for."   Id. ¶ 168 (brackets omitted).   DSS did not invite her to interview for the

---

[20]Requisition 90014 was opened to fill the same employment position
proposed in Requisition 80867.   (Docket 47 ¶ 148).

position.  Id. ¶ 155.  Ms. Sletto agreed L.H., a white applicant who was hired for the position, "didn't have any one of those three criteria met."  Id. ¶¶ 115 & 169.

I.R.C. applied to be an ASA Specialist in Requisition 80412.  Id. ¶ 156. Ms. Sletto was the hiring supervisor for this requisition.  Id. ¶ 167.  DSS did not invite I.R.C. to interview for the position.  Id.  J.V., a white applicant, was hired for the position.  Id. ¶ 157.

I.R.C. applied to be an Employment Specialist in Requisition 80495.  Id. ¶ 158.  Mr. Kearns was the hiring supervisor for this requisition.  Id. ¶ 170.  He "chose to interview [I.R.C.] based off her application materials."  Id. ¶ 171.  More specifically, Mr. Kearns agreed I.R.C. was granted an interview because "her applications materials expressed the criteria that he was looking for."  Id. (brackets omitted).  DSS interviewed I.R.C. and rejected her for the position. Id. ¶ 158.  DSS cancelled the requisition without a hire.[21]  Id. ¶ 159.

I.R.C. applied to be an Employment Specialist in Requisition 80838.  Id. ¶ 160.  Mr. Kearns was the hiring supervisor for this requisition.  Id. ¶ 170. Again, Mr. Kearns chose to interview I.R.C. for the same reasons he expressed regarding Requisition 80495.  Id. ¶ 171.  DSS interviewed I.R.C. and rejected

---

[21]Requisition 80630 was opened to fill the same employment position proposed in Requisition 80495.  (Docket 47 ¶ 159).  T.R. applied to Requisition 80630 and interviewed for the position, but was rejected.  Id. ¶ 89. Requisition 80630 was closed without a hire.  Id. ¶ 90.

her for the position.   Id. ¶ 160.   DSS hired M.B., a white applicant, for

Requisition 80838.   Id. ¶ 161.

I.R.C. applied to be a Benefits Specialist in Requisition 80602.   Id. ¶ 162.

DSS marked her disposition as "unable to contact."   Id.

I.R.C. applied to be an Employment Specialist in Requisition 100570.

Id. ¶ 163.   DSS interviewed I.R.C. and rejected her for the position.   Id.

I.R.C. applied to be a Benefits Specialist in Requisition 100573.   Id. ¶ 164.

DSS interviewed I.R.C. and rejected her for the position.   Id.

I.R.C. applied to be an ASA Specialist in Requisition 101685.   Id. ¶ 165.

DSS interviewed I.R.C. and rejected her for the position.   Id.

I.R.C. applied to be a Benefits Specialist in Requisition 1384.   Id. ¶ 166.

She did not provide a racial self-identification in this application.   Id.   Mr.

Bakley was the hiring supervisor for this requisition.   Id. ¶ 172.   Reviewing her

resume, Mr. Bakley noted I.R.C.'s "education and experience" would have

influenced his decision to offer her an interview.   Id. ¶ 173.   Specifically, he

noted she had a bachelor's degree in human services, work experience in human

services and work experience at DSS.   Id.   DSS interviewed I.R.C. and rejected

her for Requisition 1384.   Id. ¶ 166.

ANALYSIS

The United States moves for "partial summary judgment on its *prima

facie* case that [DSS] engaged in a pattern or practice of intentional

discrimination against Native Americans when hiring Specialists at its Pine

Ridge office from 2007 through 2013." (Docker 45 at p. 1). The government contends the undisputed material facts "show[] a statistically significant difference in the treatment of Native Americans and white applicants aggregated for all positions over this time period." (Docket 46 at p. 11) (referencing Docket 47 ¶¶ 63 & 66). Plaintiff contends the "[i]ndividual examples of qualified Native American applicants whom DSS rejected . . . support the bare numbers." Id. (referencing Docket 47 ¶¶ 86-173). The government argues "[t]ogether, these undisputed facts raise the inference that discrimination infected DSS's 'standard operating procedure' when hiring at Pine Ridge . . . such that the United States is entitled to summary judgment on its *prima facie* case." Id.

DSS claims plaintiff is not entitled to summary judgment "because its statistical evidence is not significant enough to support a prima facie pattern-or-practice claim, and because there are genuine issues of material fact regarding its statistical and anecdotal evidence." (Docket 52 at p. 2). DSS contends the government's motion for partial summary judgment is inappropriate because it "seeks to shift the burden of production to DSS at trial." Id. at p. 3. DSS argues the government's "motion appears to be requesting an advisory opinion that, based on the evidence [the government] is prepared to present to the jury during its case-in-chief, it will meet its burden to show a prima facie case. The Court should decline to issue such an advisory ruling." Id. "Should the Court deny DSS's motion for summary

judgment and this case proceeds to trial," DSS submits the United States "should be required to put on its evidence in the normal course and order." Id. at p. 5.

DSS argues "[w]hile the Plaintiff is correct that the Court must take Dr. Aiken's analyses at face value for purposes of DSS's motion for summary judgment, [the government] submit[s] no authority in support of the proposition that the Court must take Dr. Aiken's analyses at face value for purposes of the Plaintiff's own motion for partial summary judgment." Id. at pp. 6-7. Defendant contends "the Court must [not] operate behind a veil of ignorance with respect to Dr. Aiken's analyses." Id. at p. 7. "To the extent the Court does so, DSS incorporates its arguments regarding the shortcomings of Dr. Aiken's report from its Brief in Support of Motion for Summary Judgment." Id. at p. 7 n.2 (referencing Docket 43). "Because the experts disagree as to whether the differences in DSS's hiring rates of Native Americans and Caucasians were statistically significant, much less whether there were 'gross statistical disparities,' " DSS submits "summary judgment in the Plaintiff's favor is inappropriate." Id. at p. 8.

In reply, the United States argues a ruling on its motion for partial summary judgment "would allow the Court to efficiently focus a bench trial on the remaining issues in dispute." (Docket 56 at p. 2). The government submits DSS is "mistaken that there will be a jury to whom the Court would need to explain its summary judgment ruling." Id. at p. 3. Plaintiff points out

that "[u]nder Title VII, as amended by the Civil Rights Act of 1991, the parties are not entitled to a jury trial *unless* the plaintiff seeks compensatory or punitive damages. . . . Because the United States' Amended Complaint does not include a demand for either type of damages, DSS simply is not entitled to a jury." Id. (emphasis in original) (referencing 42 U.S.C. § 1981a(c)(1) & Docket 26).

> Plaintiff submits
>
> [T]the United States has established its *prima facie* case that DSS engaged in a pattern or practice of intentional discrimination with undisputed evidence. . . . The undisputed applicant-flow data shows that DSS hired Native American applicants at a statistically significantly lower rate than white applicants across the seven years . . . . This "gross statistical disparity" is buttressed by the undisputed evidence that DSS offered to hire *zero* Native Americans in five of the seven years . . . and that DSS repeatedly rejected admittedly qualified Native American applicants . . . .

Id. at p. 6 (emphasis in original; internal references omitted). The government argues "[n]o more is required for the *prima facie* case." Id. at p. 8 (referencing EEOC v. American National Bank, 652 F.2d 1176, 1192 (4th Cir. 1981) and Hazelwood School District, 433 U.S. at 307-08).

The government's motion for partial summary judgment seeks to resolve only the first step of the Teamsters analytical process. "The United States asks only that the Court consider whether [the government] has met its initial *prima facie* burden to show a pattern or practice of intentional discrimination." (Docket 56 at p. 12). "The United States maintains that its evidence of a gross statistical disparity, further supported by the inexorable zero Native American

37

hires for five of the seven years and the repeated examples of rejected Native American applicants whom DSS admits were qualified, easily meets this standard." <u>Id.</u> at pp. 12-13.

The defendant's challenge to plaintiff's motion for partial summary judgment is misplaced. The court must take Dr. Aiken's analysis as true, not because the government asserts the court should accept the evidence, but because the defendant's response to plaintiff's statement of undisputed material facts acknowledged the expert's statistical analysis is accurate. <u>Compare</u> Docket 47 ¶¶ 35-53 & 59-76 with Docket 50 ¶¶ 35-53 & 59-7. Defendant's argument that the expert's testimony is flawed does not overcome DSS's acknowledgment that the statements are factually accurate. There is no "genuine dispute as to any material fact" regarding Dr. Aiken's findings. Fed. R. Civ. P. 56(a).

Whether DSS can successfully challenge Dr. Aiken's findings will be determined in the second step of the analysis under <u>Teamsters</u>. Only if and after the government makes out a prima facie case does the burden shift to DSS "to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." <u>Teamsters</u>, 431 U.S. at 360. DSS may present evidence in an "attempt to show" the government's " 'proof is either inaccurate or insignificant.' " <u>Craik</u>, 731 F.2d at 470 (citing <u>Teamsters</u>, 431 U.S. at 360).

The government's undisputed evidence shows the standard deviation was 3.47, which is generally accepted as evidence that race played a significant role in the hiring practices of DSS.   See Castaneda v. Partida, 430 U.S. 482, 496-497 n.17 (1977) ("if the difference between the expected value and the observed number is greater than two or three standard deviations,' then the hypothesis that teachers were hired without regard to race would be suspect."); Craik, 731 F.2d at 476 n. 13 ("standard deviations greater than two or three necessarily exclude chance as a cause of underrepresentation.") (referencing American National Bank, 652 F.2d at 1192).   The court finds this "gross statistical disparit[y]" considered "alone . . . constitute[s] prima facie proof of a pattern or practice of discrimination."   Hazelwood School District, 433 U.S. at 307-08 (referencing Teamsters, 431 U.S. at 339).

Even if the court were to find this statistical evidence was not independently significant and sufficient to satisfy the government's burden to prove a prima facie case of discrimination, the court finds when the statistical evidence is considered in conjunction with the other relevant undisputed facts stated above the discrepancies in hiring appear to be due to unlawful racial discrimination.   See Craik, 731 F.2d at 476 n.13 ("Statistical evidence showing less marked discrepancies will not alone establish that something other than chance is causing the result, but we shall consider it in conjunction with all the other relevant evidence in determining whether the discrepancies were due to unlawful discrimination.").

The other two pieces of relevant undisputed evidence are that (1) the DSS Pine Ridge Office hired zero Native Americans during five of the seven years under scrutiny in this case, and (2) the anecdotal evidence from the nine Native American applicants who were unable to gain employment with the DSS Pine Ridge Office.   Morgan, 380 F.3d at 471.   This additional evidence brings the cold statistical data to life.   Id.   Considered together, the government carried its burden to establish a prima facie case of a pattern or practice of discrimination.

The court finds as a matter of law the government's motion for partial summary judgment must be granted.   Fed. R. Civ. P. 56(a); Teamsters, supra; Morgan, supra.

Defendant originally sought a jury trial on plaintiff's complaint.   See Docket 9.   However, when the United States removed its claim for compensatory damages from the amended complaint, defendant's jury trial demand became moot.   See 42 U.S.C. § 1981a(c)(1).   The remainder of the issues in this case will be resolved by a trial to the court.

## ORDER

Based on the above analysis, it is

ORDERED that the defendant's motion for summary judgment (Docket 41) is denied.

IT IS FURTHER ORDERED that the plaintiff's motion for partial summary judgment (Docket 45) is granted.

IT IS FURTHER ORDERED that the government has satisfied its burden and established a prima facie case that the defendant in the DSS Pine Ridge Office engaged in a pattern or practice of racial discrimination during the years 2007 through 2013.

IT IS FURTHER ORDERED that at the trial on count 1, the defendant will have the opportunity "to defeat the prima facie showing by demonstrating that the Government's proof is either inaccurate or insignificant." Teamsters, 431 U.S. at 360. "If the defendant satisfies its burden of production," the court "must then determine, by a preponderance of the evidence, whether the [defendant] engaged in a pattern or practice of intentional discrimination." Reynolds, 685 F.3d at 203. "If the [defendant] fails to rebut the inference that arises from the Government's prima facie case, [the] . . . court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, [the] court's finding of a pattern or practice justifies an award of prospective relief." Teamsters, 431 U.S. at 361.

IT IS FURTHER ORDERED that at the trial, the court will receive and consider all evidence relevant to count 1 of the amended complaint (Docket 26) and defendant's answer (Docket 27).

Dated September 25, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE